JAMES H. ALEVIZOS AND OTHERS v.
METROPOLITAN AIRPORTS COMMISSION
OF MINNEAPOLIS AND ST. PAUL.

216 N. W. 2d 651.

March 15, 1974—No. 42871.

*Mastor & Mattson, Richard J. Gunn,* and *Charles R. Hall,* for appellants.

*Oppenheimer, Wolff, Foster, Shepard & Donnelly, Gordon Shepard, Michael Berens,* and *Wayne G. Faris,* for respondent.

KELLY, JUSTICE.

Petitioners appeal from an order of the Hennepin County District Court sustaining a demurrer to and dismissing their complaint and petition for writ of mandamus to compel respondent, Metropolitan Airports Commission of Minneapolis and St. Paul (MAC), to institute condemnation proceedings against the properties owned by petitioners and others similarly situated within their class and from the order denying their motion to have this action maintained as a class action. We reverse.

The central issues raised on this appeal are as follows:

(1) Does mandamus lie against MAC to compel it to institute condemnation proceedings to compensate landowners whose lands are claimed to have been taken or damaged by the operation of aircraft?

(2) Is a class action the proper and most efficient method for the adjudication of the rights of parties affected?

In connection with these issues, the parties have raised numerous related questions, some of which apparently were not considered by the trial court when it sustained respondent's demurrer.

This action was commenced by a group of property owners who reside under or near the take-off and landing flight paths for the Minneapolis-St. Paul International Airport. The 100 petitioners-appellants reside in the area of the city of Minneapolis, Hennepin County, generally referred to as South Minneapolis. They sought to bring this action as a class action on behalf of themselves and all others similarly situated. An affidavit filed in behalf of petitioners' motion before the district court indicates that the property affected would include approximately 27,565 homes, apartments, churches, places of business, and other buildings located in Hennepin, Ramsey, and Dakota counties. Petitioners compose a community cross section which includes the following occupations: A dentist, doctor, minister, lawyer, law

professor, clerical and executive employees, a real estate appraiser, retired persons, a personnel manager, and a court reporter.

The class encompasses owners of all properties located within four corridors or sound cones emanating from the airport. These corridors extend generally northwest, northeast, southwest, and southeast from the airport. An outline of the four corridors is superimposed on a map accompanying the petitioners' complaint, but this depiction was produced as part of a study projecting airport activity levels for the year 1985 and thus it is not intended to be a definitive or uncompromising delineation of those properties which are affected in such a significant way as to make their owners proper parties to this lawsuit.

MAC, a public corporation, governed by Minn. St. 360.101 to 360.144, was created in and for the cities of Minneapolis and St. Paul pursuant to legislation enacted in 1943. L. 1943, c. 500. The Minnesota Legislature set forth in the governing statute all of the details concerning its purposes, powers, membership, organization, financing, and jurisdiction. MAC was given the authority, resources, and responsibility for building and regulating the airport system that serves the Twin Cities metropolitan area. Respondent in its brief refers to a comprehensive summary of MAC's background and development contained in a recent law review article, Harper, *The Minneapolis-St. Paul Metropolitan Airports Commission*, 55 Minn. L. Rev. 363. The author who is a professor of transportation in the University of Minnesota School of Business Administration points out that Wold-Chamberlain Field was operated as an airport in the 1920's by the Minneapolis Park Board. With the advancement of technology and the increasing demand for airport services, Wold-Chamberlain Field has grown from a 2,000-foot sodded landing strip in 1920 to several concrete runways with lengths of 6,200, 8,250, and 10,000 feet in 1970. Most of this expansion took place during the late 1950's and early 1960's under the direction of MAC. While the airport facilities were growing in size, the type

of aircraft using it likewise underwent a metamorphosis from internal combustion and turbine powered aircraft to jet propelled aircraft of larger size and greater number.

The airport facilities were financed in part through grants-in-aid from the Federal government to MAC as the sponsoring local agency. The grants were given pursuant to a number of assurances, conditions, and agreements by MAC relating to the operation and use of the airport. These assurances, conditions, and agreements remain binding upon MAC.

The determination of flight glide paths, take-off and landing directions and angles, movement of aircraft in general, and certification of the various types of aircraft which may use the airport are all under the authority of the secretary of transportation. 49 USCA, §§ 1348, 1402, and 1421.

MAC has been accorded tax support by the legislature to further the operation of its facilities and develop airports. This support arises from the taxing authority given to Minneapolis and St. Paul to levy property taxes for MAC's benefit. This taxing authority is limited in amount, however, to a tax levy up to an annual 1-mill limit on assessed valuation to support operating budgets. Minn. St. 360.116. Since 1962, MAC's operating budget has not needed nor used this potential tax support. In addition, MAC has the authority to issue general obligation revenue bonds to a present maximum limit of $125,000,000, of which all but $9,000,000 have been issued. Economic forecasts made in connection with the proposal for a second major airport indicate that MAC has a capability to debt service out of airport-generated resources an additional $17,000,000 in bonding.

Petitioners allege that MAC in the operation and use of the Minneapolis-St. Paul International Airport has interfered with the use and enjoyment of their property to such an extent as to amount to a taking, requiring compensation under the Constitution of the State of Minnesota. Minn. Const. art. 1, § 13. In support of this contention, petitioners have alleged that respondent's

operation has interfered with their use of the property in a number of ways. In their complaint, it is alleged, inter alia:

"By reason of defendant's use and operation of the Minneapolis-St. Paul International Airport, aircraft take off and land in great numbers at said airport, at irregular intervals at all hours of the day and night. Said aircraft fly at low altitudes within the airspace immediately above or in close proximity to the property of the plaintiffs.

"Such activity of the defendant has caused and is causing air and noise pollution to invade the property of the plaintiffs to such a degree that physical damage to such property has resulted and to such an extent that plaintiffs have been deprived of the free and unmolested use, possession and quiet enjoyment of their property.

"The activity of the defendant creates deafening, disturbing and frightening noises and vibrations to intrude upon the property of the plaintiffs, and causes dust and oily grime to pass over and to settle upon plaintiffs' property and in the homes and other structures located thereon.

"Defendant, by such activity, is perpetuating a continuing trespass and maintaining a continuing nuisance to such an unreasonable degree that plaintiffs have been greatly molested and annoyed thereby.

"Such acts of the defendant disrupt sleep, interfere seriously with entertainment and normal peaceful enjoyment and use of the property of the plaintiffs; interrupts and prevents normal conversation and communication, use and enjoyment of the telephone, television and radio; and creates fear, nervousness and apprehension on the part of the plaintiffs and others lawfully in and upon the property of the plaintiffs.

"The defendant, by such activity, has caused depreciation and diminution of the market value of the property of the plaintiffs, has confiscated and condemned such property, has interfered with the ownership, possession, and enjoyment and value of such property and has caused a taking or damaging of the property

of the plaintiffs for its use, without just compensation having been paid, without due process of law, and contrary to the Constitution and the Laws of the State of Minnesota and the Constitution of the United States of America."

Petitioners contend that all of these interferences have resulted in a substantial detrimental effect upon the market value of the properties under and near the aircraft flight paths. One property owner estimated his property decreased 20 percent in value. Four professional real estate appraisers filed affidavits in which they stated their belief that the property below and near the flight paths had been substantially and measurably decreased in value.

Because of the posture of this appeal, this court must assume that all of the foregoing allegations and contentions are true and base its decisions on that assumption.

■ Does mandamus lie against MAC to compel inverse condemnation?

Petitioners in this case have brought an action in inverse condemnation against MAC as a result of noise and pollution from the operation of airplanes directly over and near their properties. Inverse condemnation has been described as:

"* * * [T]he popular description of a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." Thornburg v. Port of Portland, 233 Ore. 178, 180, note 1, 376 P. 2d 100, 101 (1962).

The trial court, in its memorandum supporting the dismissal of this action, analyzed the existing case law in inverse condemnation by airplane overflight. Citing Batten v. United States, 306 F. 2d 580 (10 Cir. 1962), it concluded that a physical trespass is required.

In the development of the common law, courts have attempted to place their decisions in legal pigeonholes sometimes described

as legal fictions. These legal fictions and theories have undergone not only minor changes, but also drastic changes to meet the varying contemporary needs of society and to improve our system of justice. The courts which have ordered inverse condemnation based upon overflights of airplanes have done so, in general, either on the theory of trespass or on the theory of nuisance. Perhaps at one time in the history of common law, a direct overflight by an airplane would unquestionably have been a trespass, as ownership of land included ownership of the airspace directly above to the periphery of the universe. In United States v. Causby, 328 U. S. 256, 260, 66 S. Ct. 1062, 1065, 90 L. ed. 1206, 1210 (1946), the Supreme Court of the United States stated:

"It is ancient doctrine that at common law ownership of the land extended to the periphery of the universe—*Cujus est solum ejus est usque ad coelum.* But that doctrine has no place in the modern world. The air is a public highway, as Congress has declared. Were that not true, every transcontinental flight would subject the operator to countless trespass suits. Common sense revolts at the idea. To recognize such private claims to the airspace would clog these highways, seriously interfere with their control and development in the public interest, and transfer into private ownership that to which only the public has a just claim."

In determining whether or not inverse condemnation should be ordered as to landowners near airports, some courts, following the trespass theory, have insisted upon direct overflights before permitting recovery. Other courts have permitted inverse condemnation on the nuisance theory without requiring a direct overflight. Mr. Chief Justice Kenneth J. O'Connell of the Oregon Supreme Court, in questioning the need for the distinction between nuisance and trespass, has written "Why not simply declare that henceforth all invasions of interest in land, whether affecting the interest of exclusive possession or the interest in use and enjoyment, are to be embraced in one tort?" O'Connell, *Streamlining Appellate Procedures,* 56 J. Am. Jud. Soc. 234, 238.

On the other hand, should we consider giving trespass a new look? After all, if we can take away the rights of landowners to a part of the airspace directly above their land, can we not treat the invasion of their land by sound waves, fumes, oil, and what not as a recognizable trespass? A suggestion of this sort was made in Laird v. Nelms, 406 U. S. 797, 800, 92 S. Ct. 1899, 1901, 32 L. ed. 2d 499, 503 (1972), where Mr. Justice Rehnquist stated:

"* * * Perhaps the precise holding of *United States v. Causby, supra,* could be skirted by analogizing the pressure wave of air characterizing a sonic boom to the concussion that on occasion accompanies blasting, and treating the air wave striking the actual land of the property owner as a direct intrusion caused by the pilot of the plane in the mold of the classical common-law theory of trespass."

However, he did point out that the theory of liability for blasting is "conceded to be strict liability for undertaking an ultrahazardous activity, rather than any attenuated notion of common law trespass." 406 U. S. 800, 92 S. Ct. 1901, 32 L. ed. 2d 503.

Any discussion of whether inverse condemnation should be anchored to a nuisance theory, a trespass theory, a trespass theory with a new look, or on some combination of these theories should be preceded by a summary of United States Supreme Court decisions dealing with inverse condemnation, i.e., United States v. Causby, 328 U. S. 256, 66 S. Ct. 1062, 90 L. ed. 1206 (1946); and Griggs v. Allegheny County, 369 U. S. 84, 82 S. Ct. 531, 7 L. ed. 2d 585 (1962).

The Causby case involved an action by the owner of property located directly below the take-off and landing glide path of an airport used extensively by military aircraft. No actual touching of the property's surface was found. Aircraft passing as low as 67 feet above his house caused the plaintiff much anxiety and discomfort in addition to ruining his chicken raising business. The supreme court initially brushed aside the argument based

on the common-law principle that ownership of property extends to the periphery of the universe and held that Causby had suffered a compensable taking under the Fifth Amendment. While not defining precisely what elements are necessary for a taking by overflight, the court indicated several of the factors it found significant in reaching its decision. It thereby created confusion, however, because it used concepts of nuisance and trespass alternatively as the bases for the holding. Elements of trespass were relied upon by the court when it stated that although a direct touching of the property was not necessary, an invasion of that airspace above the ground which the landowner can occupy and use in connection with the land would be a taking. The court then went on to indicate that factors such as inconvenience, frequency, interference, and rights to the enjoyment and use of land played a significant role in reaching its decision—concepts normally associated with nuisance actions. Thus, if a trespass is required, may only those people affected by direct overflight of their property recover? If a nuisance concept may be applied, then may all those whose use and enjoyment of their property is substantially interfered with recover regardless of the flightpath's location? In 1962, the Supreme Court decided Griggs v. Allegheny County, *supra*, a case also involving direct overflight of property near an airport. Mr. Justice Douglas, speaking for the court, reaffirmed Causby, but did not clarify it.

The lower Federal courts which have dealt with this issue have almost unanimously allowed recovery only to those property owners located directly below the flight path. Batten v. United States, 306 F. 2d 580, 583 (10 Cir. 1962). See, also, Avery v. United States, 165 Ct. Cl. 357, 366, 330 F. 2d 640, 645 (1964); Bellamy v. United States, 235 F. Supp. 139, 140 (D. S. C. 1964); Leavell v. United States, 234 F. Supp. 734, 739 (D. S. C. 1964); and Neher v. United States, 265 F. Supp. 210, 216 (D. Minn. 1967). This approach more nearly resembles the trespass theory rather than the nuisance theory and for ease in reference, we refer to it as such.

The state court decisions have largely deviated from the Federal court pattern by allowing recovery both to those property owners directly beneath the flight path and to those near the flight path. However, this difference in result may not be inconsistent with the Federal court decisions because the Fifth Amendment to the United States Constitution refers only to a *taking* of property, whereas many state constitutions similar to Minnesota's require compensation where private property is "taken, destroyed or damaged." Minn. Const. art. 1, § 13. Some state court opinions have cited similar provisions in their state constitutions as support for allowing recovery to property owners both under and near the flight path. See, Martin v. Port of Seattle, 64 Wash. 2d 309, 316, 391 P. 2d 540, 545 (1964). A number of state courts, however, have dismissed the significance of this distinction and have allowed compensation to all parties whether in the flightpath or near it by interpreting the Causby and Griggs cases as allowing recovery based on a nuisance theory.

In the leading state decision, Thornburg v. Port of Portland, 233 Ore. 178, 376 P. 2d 100 (1962), the Oregon constitutional provision was similar to that of the United States Constitution. The Oregon Supreme Court took note of the line of Federal cases requiring direct overflight, but explained that their rationale was circular because "[t]he majority [in Batten v. United States, *supra*] said in effect that there is no taking because the damages are consequential, and the damages are consequential because there is no taking." 233 Ore. 187, 376 P. 2d 104. The Oregon court in rejecting the majority opinion of the Batten court and following the dissent of Chief Judge Murrah, stated:

"If we accept, as we must upon established principles of the law of servitudes, the validity of the propositions that a noise can be a nuisance; that a nuisance can give rise to an easement; and that a noise coming straight down from above one's land can ripen into a taking if it is persistent enough and aggravated enough, then logically the same kind and degree of interference

with the use and enjoyment of one's land can also be a taking even though the noise vector may come from some direction other than the perpendicular." 233 Ore. 192, 376 P. 2d 106.

In another case, the Supreme Court of Washington rejected the Federal courts' rationale by saying:

"* * * We are unable to accept the premise that recovery for interference with the use of land should depend upon anything as irrelevant as whether the wing tip of the aircraft passes through some fraction of an inch of the airspace directly above the plaintiff's land." Martin v. Port of Seattle, 64 Wash. 2d 309, 316, 391 P. 2d 540, 545 (1964).

Thus, it appears that the state and lower Federal courts have interpreted the Causby and Griggs decisions differently. This may be partly due to differing language of the state constitutions and the Federal Constitution, but as was pointed out in the Thornburg and Martin decisions, that difference has not been the determinative factor. The court in Thornburg held that a compensable taking occurs whenever governmental activity substantially interferes with the useful possession of property, either by repeated trespasses or by repeated nontrespassory invasions called nuisances. Reliance on a nuisance theory would clearly give relief to any property owner living near the flightpaths who could show interference with his rights sufficient to amount to a taking. The Washington court in Martin did not, however, definitely rely on a nuisance theory in allowing recovery to landowners irrespective of their location. Instead, that court cited as the better rule the dissent in Batten v. United States, *supra*, where it was said:

"* * * [T]he constitutional test in each case is first, whether the asserted interest is one which the law will protect; if so, whether the interference is sufficiently direct, sufficiently peculiar, and of sufficient magnitude to cause us to conclude that fairness and justice, as between the State and the citizen, re-

quires the burden imposed to be borne by the public and not by the individual alone." 306 F. 2d 587.

The significance of this test is that it does not give the jury the opportunity to balance the utility of the airport against the rights of the individual as would normally be done under a nuisance theory of relief. To undertake such a balancing process would in almost every instance spell defeat for the property owner. The Oregon Supreme Court acknowledged this weakness of its 1962 decision when it decided a case in 1966 arising out of the same facts as the earlier decision. Thornburg v. Port of Portland, 244 Ore. 69, 415 P. 2d 750 (1966). In the second opinion the Oregon court held that the jury should not be asked to balance the individual property owner's rights against that of the public good derived from the airport. Rather, the court held that the jury should be instructed to determine whether the property owner's right to the use and enjoyment of his land has been infringed in such a substantial way that a loss of market value results; if so, then a taking has occurred and the jury only need determine the amount of compensation.[1]

---

[1] The Washington court discussed the meaning of "substantial" interference as follows: "When this action is analyzed in this manner, the term 'substantial' is of dubious relevancy or utility. It connotes a balancing of the interests of the public in general against those of the individual. Inherent is the idea that the individual must bear a certain amount of inconvenience and loss of peace and quiet as the cost of living in a modern, progressing society. In eminent domain, and in inverse condemnation, such a balancing does not have to be accomplished as a distinct process, simply because the individual seeks no recovery for his individual suffering, damage, loss of quiet, or other disturbance. These elements of damage are cognizable in a tort action, and such a balancing would thus be necessary. But in inverse condemnation the measure of recovery is injury to market value, and that alone.

"Therefore, the balance of interest inherently struck in this type of action comes about in the following manner. If the individual is unusually sensitive, and sustains a greater injury than might be suffered by the general public from such interference, the public interest in maintaining the flights leaves him to one remedy—to sell his property

Unlike Washington and Oregon, under Minnesota law the question of whether or not a governmental agency has exceeded its authority to such a degree as to amount to a taking of private property is a question of law to be determined in the initial instance by the trial court.[2] Only then is the jury asked to decide what amount of money will adequately compensate the property owner. See, Thomsen v. State, by Head, 284 Minn. 468, 474, 170 N. W. 2d 575, 580 (1969), wherein this court stated:

"While ordinarily an adjoining property owner could not recover from the state solely because the value of his property is decreased by noise and light from traffic on a newly constructed

and move. This is no different than it would be had his land been condemned for forced sale to the state. But whichever way the state exacts such a 'sale,' it must pay the individual the amount he suffers in the diminishment of the value of his land, as reflected by the decrease in the amount he can receive in a sale to a willing buyer. Such lowering of market value reflects not the personal injury to the individual, but the lesser desirability of the land to the general public; i.e., to a ready, able, and willing buyer. When the land of an individual is diminished in value for the public benefit, then justice, and the constitution, require that the public pay.

"In the above manner, the interests which would otherwise be protected by the requirement of a 'substantial' injury are vindicated in two distinct ways. First, where there is only an injury of the extent such that it should be called or labeled 'incidental,' no measurable or provable decline in market value could be expected traceable to the flights. Recovery would not be forthcoming, but not because of some arbitrary rule set for convenience in administration of justice, but because of an inability to prove damages according to the common and well understood rules of suit. Second, and even more significant to the balancing problem, the smaller the provable decline in market value, the slighter the burden cast upon the public in paying for it. Surely the protection of the public interest does not entail the refusal of *small* claims on the ground that the burden to the public is not great enough to pay for!" Martin v. Port of Seattle, 64 Wash. 2d 309, 318, 391 P. 2d 540, 546 (1964).

[2] Compare the procedure used by the Supreme Court of California in the case of Nestle v. City of Santa Monica, 6 Cal. 3d 920, 101 Cal. Rptr. 568, 496 P. 2d 480 (1972).

highway, whether plaintiff's property has been so unfairly, directly, substantially, and peculiarly injured that it has been damaged in the constitutional sense so that the state should be compelled to condemn it is, given all of the undisputed but highly unusual facts of this case, a question of law which must be determined by the mandamus court in the first instance."

The trial court with some justification concluded from Thomsen that the property owners involved in this action could not recover because they failed to show damage that is direct, substantial, and peculiar to them in that it differs markedly from the damage suffered by the public at large. We think that the test in Thomsen should not have been so narrowly construed and that the language used needs some amplification.

What, then, are the guidelines to be followed by the trial court, on remand, in reaching its initial determination as mandated by Thomsen? It should be pointed out initially that the Minnesota Constitution requires compensation where private property is taken, destroyed, or damaged. Any statement of what constitutes "property" can only be nebulous at best. Not every economic, social, or other interest or advantage is a property right, the taking of which must be compensated. As the United States Supreme Court pointed out in United States v. Willow River Power Co. 324 U. S. 499, 502, 65 S. Ct. 761, 764, 89 L. ed. 1101, 1107 (1945), only those economic advantages which have the law back of them are property rights. Thus, to begin by arguing that compensation must be paid because a property right has been taken really merely raises the question that must be ultimately answered. Property is more than the physical thing—it involves the group of rights inhering in a citizen's relation to the physical thing. Traditionally, that group of rights has included the rights to possess, use, and dispose of property.[3] See,

---

[3] The Ohio Supreme Court summarized these ideas quite well when it stated: "In some of the early cases in this country, the courts, adhering to the conception of property as the thing owned, construed the taking alluded to in state constitutions to be a 'taking altogether,' ap-

United States v. General Motors Corp. 323 U. S. 373, 378, 65 S. Ct. 357, 359, 89 L. ed. 311, 318 (1945). Petitioners in this case do not allege that they have been dispossessed by MAC's operations. They allege that their right to use the property without undue interference has been infringed and the decrease in market value due to defendant's operations has deprived them of their right to dispose of their property for a fair price. The right to use one's property in relative freedom from irritating noise and interference can hardly be disputed in view of present-day living conditions where a great deal of governmental and private effort is spent on planning and zoning our cities in an effort to improve the quality of life. These societal efforts to protect certain land uses from irritating interferences, then, indicate that the use and enjoyment of one's property without unduly irritating noise, vibrations, and gaseous fumes have arisen to the status of a property right for which a property owner may demand compensation when it is denied to him by governmental activity.

This does not mean that every noise or interference with a property owner's use and enjoyment thereof constitutes a taking. Every landowner must continue to endure that level of inconvenience, discomfort, and loss of peace and quiet which can be reasonably anticipated by any average member of a vibrant and progressive society. But when those interferences reach the point where they cause a measurable decrease in property market value, it is reasonable to assume that, considering the perma-

propriation and dispossession of the owner, which deprived him of the corpus of the property, and compensation was limited accordingly. The broader view, which now obtains generally, conceives property to be the interest of the owner in the thing owned, and the ownership to afford the owner the rights of use, exclusion and disposition. Under this broad construction there need not be a physical taking of the property or even dispossession; any substantial interferences with the elemental rights growing out of ownership of private property is considered a taking." Smith v. Erie R. Co. 134 Ohio St. 135, 142, 16 N. E. 2d 310, 313 (1938).

nency of the airflights, a property right has been, if not "taken or destroyed," at the very least "damaged," for which our constitution requires that compensation be paid. This will not give relief to the unusually sensitive person because the measure of recovery is decrease in market value of the property due to its decreased desirability in the general market place rather than the amount of discomfort to the individual.

We recognize that most property in a metropolitan area would have a higher value if it were completely free of any noise, smog, or other undesirable features, provided the same conveniences were available. We are sure that if the metropolitan area had no airports, freeways, buses, trucks, trains, ambulances, and many other conveniences that are sources of noise, fumes, and whatnot, that property values would be substantially reduced. Property owners cannot—and we are sure they do not expect to—have the advantages created by conveniences and yet be paid for the undesirable effects created by the same conveniences unless those effects adversely affect their property so directly and so substantially that it is manifestly unfair to require them to sustain a measurable loss in market value which the property-owning public in general does not suffer. Thus, not every inconvenience, annoyance, or loss of peace and quiet caused by air flights will give rise to a cause of action in inverse condemnation against an airport operator.

The test, then, that we prescribe will give relief to any property owner who can show a direct and substantial invasion of his property rights of such a magnitude he is deprived of the practical enjoyment of the property and that such invasion results in a definite and measurable diminution of the market value of the property.[4]

---

[4] We doubt that using either a trespass theory or nuisance theory or a new version of either as a base or foundation would clarify the issues. Without using the term "nuisance," Restatement, Torts, § 822, describes the liability for a nontrespassory invasion of property in these words: "The actor is liable in an action for damages for a non-trespassory in-

To justify an award of damages it must be proved that these invasions of property rights are not of an occasional nature, but are repeated and aggravated, and that there is a reasonable probability that they will be continued in the future.

We recognize that with the test we have prescribed there may well be a dispute as to the property, if any, that is to be included in the inverse condemnation proceedings. Nonetheless, the court should make that determination initially based upon our interpretation of Thomsen and the market-value test here prescribed.[5]

MAC will be entitled to a jury trial on fact questions in any case by appealing from the commissioner's award. If the court determines any petitioner is not entitled to inverse condemna-

vasion of another's interest in the private use and enjoyment of land if,

"(a)   the other has property rights and privileges in respect to the use or enjoyment interfered with; and

"(b)   the invasion is substantial; and

"(c)   the actor's conduct is a legal cause of the invasion; and

"(d)   the invasion is either

(i)   intentional and unreasonable; or

(ii)   unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultrahazardous conduct."

[5] A majority of the court is of the opinion that in appropriate cases the trial court may consider among other factors, the following:

(1)   The highest and best use to which the land may be put, as well as its present use, recognizing differences in the impact of sound and air pollution on areas suitable or zoned for residential, commercial, industrial, or recreational purposes.

(2)   The topography of the land, including natural or artificial sound barriers.

(3)   The proximity to runways.

(4)   The lateral and vertical distances from regular flight paths.

(5)   The frequency of takeoffs and landings.

(6)   The types of airplanes using the facilities.

(7)   The flight patterns, holding patterns, and glide angles regularly followed.

(8)   The location of the land relative to prevailing winds.

(9)   Whether the duration of the easement contemplated is temporary or permanent.

tion, a jury trial shall be essential as to any fact questions. Thus, as to both MAC and petitioners, the Thomsen mandate for a jury trial on fact issues in a mandamus action will be followed.

The trial court also dismissed this action on the ground that MAC was not the proper defendant in that the airport was built largely with Federal funds in conformance with Federal specifications, and aircraft operations are largely controlled by Federal agencies. The United States Supreme Court dealt a similar argument a decisively fatal blow when it said:

"* * * We think, however, that respondent, which was the promoter, owner, and lessor of the airport, was in these circumstances the one who took the air easement in the constitutional sense. Respondent decided, subject to the approval of the C. A. A., where the airport would be built, what runways it would need, their direction and length, and what land and navigation easements would be needed. The Federal Government takes nothing; it is the local authority which decides to build an airport *vel non*, and where it is to be located. We see no difference between its responsibility for the air easements necessary for operation of the airport and its responsibility for the land on which the runways were built." Griggs v. Allegheny County, 369 U. S. 84, 89, 82 S. Ct. 531, 534, 7 L. ed. 2d 585, 589.

We believe the rationale of the position cited above is equally applicable in this case. MAC was created for the express purpose of promoting and developing airports around the metropolitan area. Having accomplished this task, it would be incongruous for this court to hold that MAC cannot be held responsible for the adverse effects of its activities.

Since this case was tried in the lower court and after it was first argued here, the United States Supreme Court decided Burbank v. Lockheed Air Terminal, Inc. 411 U. S. 624, 93 S. Ct. 1854, 36 L. ed. 2d 547 (1973). Based on that court's holding that congress has preempted state and local control over aircraft noise, a city ordinance prohibiting jet aircraft from taking off between 11 p. m. and 7 a. m. was held invalid. This decision does not reach

the main issue before us. There is nothing in that decision indicating that Causby and Griggs were overruled. Mr. Justice Douglas wrote the majority opinion in Burbank and did not mention Causby or Griggs. Dissenting to the denial of certiorari in Chongris v. Corrigan, 409 U. S. 919, 93 S. Ct. 218, 34 L. ed. 2d 181 (1972), Mr. Justice Douglas, who authored Causby and Griggs, cited both cases with approval in these words:

"In 1946, this Court articulated the standard to be applied in testing flight patterns over private property against the Just Compensation Clause of the Fifth Amendment. United States v. Causby, 328 U. S. 256. We held that 'the flight of airplanes, which skim the surface but do not touch it, is as much an appropriation of the use of the land as a more conventional entry upon it.' We noted that the important factor is whether the intrusion impinges on 'the owner's full enjoyment of the property and . . . his exploitation of it.' Id., at 264-265. And, in 1962, we reiterated that standard. Griggs v. Allegheny County, 369 U. S. 84."

In addition, the decision in Burbank was narrowed and its thrust somewhat blunted by the footnote contained in the majority opinion:

"The letter from the Secretary of Transportation also expressed the view that 'the proposed legislation will not affect the rights of a State or local public agency, *as the proprietor of an airport,* from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the airport. Airport owners *acting as proprietors* can presently deny the use of their airports on the basis of noise considerations so long as such exclusion is nondiscriminatory.' (Emphasis added.) This portion as well was quoted with approval in the Senate Report. Ibid.

"Appellants and the Solicitor General submit that this indicates that a municipality with jurisdiction over an airport has the power to impose a curfew on the airport, notwithstanding

federal responsibility in the area. But, we are concerned here not with an ordinance imposed by the City of Burbank as 'proprietor' of the airport, but with the exercise of police power. While the Hollywood-Burbank Airport may be the only major airport which is privately owned, many airports are owned by one municipality yet physically located in another. For example, the principal airport serving Cincinnati is located in Kentucky. Thus, authority that a municipality may have as a landlord is not necessarily congruent with its police power. We do not consider here what limits if any apply to a municipality as a proprietor." 411 U. S. 624, 635, note 14, 93 S. Ct. 1854, 1861, 36 L. ed. 2d 547, 555.

Burbank is not in conflict with Causby, Griggs, or the decision to be rendered in this case. We are not asserting our police power nor are we interfering with flight schedules in enforcing a mandate under the Federal Constitution, which requires at a minimum inverse condemnation for overflights if there is a taking, and the mandate of our State Constitution, which has broader language. We are requiring MAC to condemn avigational easements, as did Causby and Griggs.

MAC denies that mandamus is a proper remedy in this action because the statute governing MAC gives it no clear legal duty to institute such proceedings, equitable considerations favor MAC, and no prior demand was made on MAC. The trial court, based on its interpretation of the governing statutes, agreed with this contention.

MAC is a public corporation under Minn. St. 360.101 to 360.144 and as such is invested with limited powers and responsibilities. As such, it has no inherent powers, but rather it only has "such powers as are expressly conferred by statute or are implied as necessary in aid of those powers which are expressly conferred." Village of Brooklyn Center v. Rippen, 255 Minn. 334, 336, 96 N. W. 2d 585, 587 (1959). See, also, Kronschnabel v. City of St. Paul, 272 Minn. 256, 259, 137 N. W. 2d 200, 202 (1965); and Mangold Midwest Co. v. Village of Richfield, 274 Minn. 347,

357, 143 N. W. 2d 813, 820 (1966). Since a writ of mandamus may be issued only "to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station" (Minn. St. 586.01), we must look at the statutory and constitutional provisions governing MAC's actions.

MAC is given specific authority to acquire all necessary right, title, or interest in real or personal property for the development and maintenance of airports by Minn. St. 360.107, subd. 2. This power of acquisition is limited by the following language of that subdivision: "Title to any such property acquired by condemnation or purchase shall be in fee simple, absolute, unqualified in any way * * *." Petitioners in this case seek to compel MAC to acquire easements over their properties by condemnation, but this statutory language standing alone appears to deny MAC the authority to acquire such rights.

Petitioners, however, contend that the language of Minn. St. 360.074 is an exception to the limitation pointed out above because it gives "municipalities," including MAC (Minn. St. 360.061), the power "to acquire such easements through or other interest in air spaces over land * * * as are necessary to effectuate the purposes of Laws 1945, Chapter 303." This argument is not convincing in view of the fact that § 360.062 clearly states that the purpose of L. 1945, c. 303, is to provide protection to the public from dangers and hazards of airport operation. It mentions nothing about discomfort and loss of property value due to noise and air pollution, as petitioners here allege they have suffered. The only other authority given to MAC to acquire less than fee simple interest is found in § 360.107, subds. 9 and 10, but those subdivisions clearly limit such acquisitions to situations where "necessary to insure safe approaches to the landing areas" and "to place, operate, and maintain suitable markings * * * for the safe operation of aircraft * * *." Thus, it seems quite clear that MAC lacks specific statutory authority to acquire the easements involved in this case. This position is given further credence by the fact that the legislature recently pro-

vided MAC with precisely the powers found lacking here, but only in connection with a new major airport. L. 1969, c. 1111, § 3, coded as Minn. St. 360.76.

Petitioners nonetheless argue with considerable persuasion that MAC was granted general powers that are broad enough to accord just compensation to property owners burdened by its activity. They point to the following language in Minn. St. 360.107, subd. 1, granting to MAC— ·

"* * * all the powers as a body corporate necessary and convenient to accomplish the objects and perform the duties prescribed by Laws 1943, Chapter 500, including those hereinafter specified, which shall not be construed as a limitation upon the general or any other specific powers hereby conferred."

Their contention based on this language is that the general powers are not controlled by the specific powers granted to MAC and that under Minn. St. 360.107, subd. 16, it had general powers to accomplish its purposes and fulfill its duties. Subd. 16 states:

"It [a metropolitan airports commission] may generally carry on the business of acquiring, establishing, developing, extending, maintaining, operating, and managing airports, with all powers incident thereto."

We have already noted above that, if we assume, as we do throughout this opinion, that the allegations in the complaint are true, petitioners suffered a taking of their private property as a result of MAC's activities. Because Minn. Const. art. 1, § 13, states that "private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured," we doubt that the legislature intended to cloak MAC with statutory provisions insulating it from claims for compensation required to be paid under that article. It seems obvious that it is "necessary and convenient" that MAC have the power to take navigational easements in order to "maintain and operate" the airport within the confines of our state constitution. We therefore hold that MAC does have the power to acquire avigational easements in this case. The extent, duration, terms,

and conditions of those easements shall be determined by the trial court.

MAC also contends that petitioners' suit is barred by laches, by the existence of an adequate remedy at law, and by a balancing of the equities. Minnesota case law clearly indicates that mandamus is an equitable remedy and that equitable defenses are available. See, State ex rel. Hennepin County Welfare Bd. v. Fitzsimmons, 239 Minn. 407, 422, 58 N. W. 2d 882, 891 (1953); Nationwide Corp. v. Northwestern Nat. Life Ins. Co. 251 Minn. 255, 265, 87 N. W. 2d 671, 679 (1958).

MAC bases its argument that laches applies on the facts that the present airport has been in operation since the 1920's; it has been steadily expanded; and it has been obvious since 1945 that it was planned as the major airport for the metropolitan area.

A comprehensive historical analysis of MAC in the Minnesota Law Review points out that most of the major expansions to the present airport have taken place after 1950, with the largest part during the 1960's. Harper, *The Minneapolis-St. Paul Metropolitan Airports Commission,* 55 Minn. L. Rev. 363, 413. The article also points out that the major expansions were vigorously opposed by nearby residents. Thus, if laches is to be applied, should it only be applied for the time in which the operations of the airport have risen to a level that has had a detrimental effect upon the plaintiffs' properties, *i.e.,* the late 1950's and 1960's? This issue was not directly passed upon by the court below. It appears, too, that there is not the complete factual setting that might be developed on this issue at a trial on the issue of inverse condemnation. We would prefer that the trial court after a hearing make findings of fact and conclusions of law on this question.[6]

---

[6] Where the overflights and near-flights constitute a taking, the court below might wish to consider them as continuing torts. This court has indicated that the statute of limitations does not run from the initial trespass. Northern States Power Co. v. Franklin, 265 Minn. 391, 122 N. W. 2d 26 (1963). We would think that MAC would prefer inverse condemnation to an injunction against further trespasses.

Respondent also submits that an adequate remedy at law exists because petitioners can apply to the State Claims Commission, which was created to hear and adjudicate claims against the state, "which, but for some statutory restriction, inhibitions, or limitations, could be maintained in the courts of the state." Minn. St. 3.7311. This would seem to apply to plaintiffs in this case because of the limitations of Minn. St. 360.107, subd. 2, (discussed above). However, awards of the commission do not impose liability upon the state except when the legislature makes an appropriation for their payment or, if an award is $250 or less, when the state department or agency against whom the award was made has funds available to pay it out of an appropriation to the department or agency. § 3.7311. Thus, at best, this is only a contingent remedy and is not sufficient to bar equitable recovery.

MAC finally asserts that an equitable balancing of the individual property owners' rights to compensation against the financial impact such payment would have on future aeronautical development is required as part of the mandamus action. Such a balancing, however, would be totally improper in an action which is basically one of eminent domain. The reason such a balancing is improper is that no individual seeks recovery in this action for personal injury, suffering, or inconvenience. Rather, petitioners seek compensation for a reduction in market value which amounts to a taking of property. This standard involves an inherent balancing, as was pointed out earlier in this opinion, in that the measure of recovery is based on decrease in value in the general marketplace rather than decrease in value to the individual property owner, thereby excluding recovery for the discomfort sustained by an unusually sensitive individual. This type of balancing exists when the state initiates the condemnation proceedings as well as when the injured property owner does so. But in either situation, a balancing of the individual's

right to recover against that of MAC's utility to society is irrelevant.

MAC's final objection to the mandamus action is that no demand was made upon MAC to commence condemnation proceedings prior to this suit. That such a demand is necessary in this state before mandamus will issue to compel a public body to do an official act is well settled. See, State v. Adams, 260 Minn. 473, 110 N. W. 2d 153 (1961); State ex rel. Sholes v. University of Minnesota, 236 Minn. 452, 54 N. W. 2d 122 (1952); State v. Schaack, 28 Minn. 358, 10 N. W. 22 (1881); and State ex rel. Hull v. Davis, 17 Minn. 406 (429) (1871). Two exceptions have been carved out of this general rule. The first one is that no prior demand is necessary where a public duty rather than a private duty is involved. State ex rel. Currie v. Weld, 39 Minn. 426, 40 N. W. 561 (1888). The Weld case defined a public duty to be one which is specifically stated in the law itself and which does not result in a benefit or burden upon any particular person so that no particular person has the right to demand performance. This exception is inapplicable to an inverse condemnation action, such as is involved here, because specific property owners have the right to demand performance. The other exception from the general rule allows a suit without prior demand where such a demand would obviously be met by rejection and therefore would be useless. This exception was noted in Regan v. Babcock, 188 Minn. 192, 201, 247 N. W. 12, 16 (1933), wherein the court held that a prior demand was unnecessary because the state highway department's constructive participation in the fraudulent contracts plaintiffs sought to annul indicated that such a demand would have been rejected. The existence of this exception to the rule was again recognized in State ex rel. Sholes v. University of Minnesota, *supra,* but was held inapplicable to the situation involved. That case involved an action to require the University's board of regents to adopt and enforce rules and regulations prohibiting all use of university property and facilities for the teaching or dissemination of any and all sectarian religious doctrine

in any manner or form. This court held that in these circumstances a prior demand was necessary because numerous acts of questionable legality were involved which would require curtailing some activities and abolishing others. In essence, this court held that the actions requested were so varied and complicated, and required so much study and analysis, that a prior demand was necessary to give the University opportunity to act to rectify the situation before the court would intervene.

The case at hand is essentially different from State ex rel. Sholes v. University of Minnesota, *supra,* in that the course of action petitioners seek to compel MAC to pursue is relatively elementary—to institute condemnation proceedings against petitioners' properties. In addition, it would appear that a prior demand would have served no constructive purpose. A study of MAC's history shows that, on a number of occasions in the past, residents of the areas involved in this action have objected to airport expansions because of the increased possibility of danger as well as noise and air pollution. 55 Minn. L. Rev. 363, 414, *supra.* These unsuccessful protests, coupled with MAC's initial denial of any liability and its vigorous defense of this action, indicate that a prior demand would have been summarily rejected and would not have served any useful purpose.

■ Is a class action the proper and most efficient method to adjudicate the rights of the parties affected?[7]

---

[7] Mr. Justice Yetka, Mr. Justice Scott, and the author of this opinion do not agree with this portion of it, which would deny the petitioners' request for a class action. We would permit the trial court to determine initially the members of the class, which would of necessity require a decision as to the perimeters of the avigational easement to be acquired. This determination would limit the number of litigants and the property involved. Thereafter the damages to be awarded, if any are, would be determined on an individual basis. We recognize that some of the owners of the parcels of land involved might not be entitled to damages but MAC should nonetheless acquire an avigational easement. This procedure would be much the same as in ordinary highway condemnation cases. In such cases property rights may be taken for highway purposes and yet in some acquisitions no damages are awarded—i.e.,

The trial court held that this was not a proper case for treatment as a class action, stating in an accompanying memorandum:

"Inverse condemnation as contemplated here appears to this Court to be incompatible with a class action since there are a multitude of individual issues and an absence of common issues. This Court cannot believe that the issues or the rights of the parties are common as between persons in close proximity to the airport, persons directly affected by overflights, persons whose property is not flown over but may be affected by noise, fumes, etc."

For the reasons stated, we concur in that part of the court's decision.[8]

---

slope easements which improve the landowners property and cases in which special benefits exceed any damages. A class action here could parallel highway condemnation cases in which the property owners are all made parties in one action, but their awards of damages are thereafter determined separately. While Rule 23, Rules of Civil Procedure, provides that all members determined by the court to be eligible as such may elect not to be included, we would agree that to remain eligible each individual would have to give written notice of his intention to be a member of the class.

For a discussion on class actions in suits against airports by property owners seeking inverse condemnation, see, Fadem and Berger, *A Noisy Airport Is a Damned Nuisance,* 3 Sw. U. L. Rev. 39, 65.

[8] The relevant portions of Rule 23, Rules of Civil Procedure, governing class actions are as follows: Rule 23.01. "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

Rule 23.02. "An action may be maintained as a class action if the prerequisites of Rule 23.01 are satisfied, and in addition:

"(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual

Another issue raised and argued in the briefs is: Should property owners who purchased their homes at a reduced price because of the overflight be required to set off this saving against the award of damages in this case? This question was not reached in the lower court and should be passed upon in the lower court, with respect to the damages sustained by such property owner.

Reversed and remanded for proceedings consistent with this decision.

MR. CHIEF JUSTICE SHERAN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

"(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."