## MARGOT SIEGEL AND ANOTHER v. MINNEAPOLIS GAS COMPANY AND OTHERS.

135 N. W. (2d) 60.

April 30, 1965—No. 39,657.

*Harold Siegel* and *Gerald Fine,* for appellants.
*Mastor, Mattson, Hart & Seran,* for respondents.

FRANK T. GALLAGHER, C.

Plaintiffs appeal from a judgment of the district court.

Plaintiffs are seeking to recover $65.69, the cost of draining certain water pipes, together with $10,000 punitive damages for defendants' alleged wrongful and malicious refusal to furnish them with natural gas service. The action was submitted to the lower court for decision on a motion by defendants for summary judgment in their favor.

Upon the pleadings, files, affidavits, and briefs of the parties, the court found: That plaintiffs are the owners of certain single-family

premises at 1133 Sixth Street North in Minneapolis; that defendant Minneapolis Gas Company, "Minnegasco," is a public utility which furnishes, sells, and distributes natural gas and natural gas service in Minneapolis and surrounding suburban communities; that defendant M. W. O'Connor is employed as an executive assistant and defendant Alex P. Disch as a supervisor in the credit department for Minnegasco; that about March 14, 1959, plaintiffs rented the premises referred to unheated to Andrew and Ruth Buckananga on a month-to-month basis; that on September 15, 1961, Isabelle Buckananga entered into a contract for gas service to said premises and on making the application stated to Minnegasco that the gas service was to be put in the name of her husband, Andrew Buckananga, and on that date Minnegasco turned on the gas to said premises occupied by Buckananga; that on February 23, 1962, Buckananga owed Minnegasco $206.77 for gas service from November 2, 1961, to February 2, 1962, and it notified Buckananga that unless the same was paid in full by February 26, 1962, the gas service to him at the premises would be terminated.

The trial court also found that on February 23, 1962, Minnegasco informed Harold Siegel that gas service to Buckananga would be terminated February 26, 1962, for nonpayment of Minnegasco's bill; that Siegel is listed as the owner of the premises on the records of Minnegasco; that subsequent to February 23, 1962, an exchange of letters took place between O'Connor and Siegel in which O'Connor threatened to terminate the gas service "if Mr. Buckananga has not paid his bill or terminated his residence," and in which Siegel expressed his request "of having the gas bill put in my name from this date forward."

The court also found that at no time did Siegel or the plaintiffs pay, or promise to pay, the past due bills for gas service to Buckananga at the premises; that on March 5, 1962, Minnegasco terminated gas service to Buckananga at the premises for nonpayment of past due gas bills then in the amount of $191.77; that on the same date Buckananga paid $15 to Minnegasco and made arrangements through his employee's credit union to pay $176.77, which

amount was received by Minnegasco on March 9, 1962, and that on March 5, 1962, Minnegasco reinstated gas service[1] to Buckananga at the premises; that subsequent to the termination of the gas service by Minnegasco, Siegel employed a plumbing and heating company at a cost of $65.69 to drain the pipes at the premises to prevent possible damage to the property; that Minnegasco continued gas service to Buckananga at the premises until October 29, 1962, at which time he notified Minnegasco that he was moving to another residence; and that charges for all gas service to Buckananga at the premises for the entire period of his occupancy were paid by him in full.

The court concluded that there was no genuine issue as to any material fact between the parties; that Minnegasco had a right to discontinue gas service to Buckananga at the premises for nonpayment of past gas service and for as long as he continued to occupy the property while the past gas services remained unpaid; that Minnegasco had no duty to restore gas service to the premises on the application of plaintiffs or Siegel as long as Buckananga continued to occupy the premises and the past gas service was unpaid; and that Minnegasco had no liability to pay or reimburse plaintiffs for the amount expended to drain the pipes on the premises. The court decreed that defendants' motion for summary judgment be granted.

The general rule is that a utility company supplying services to the public, such as water, gas, and electricity, may adopt and enforce reasonable regulations for conducting its business including one providing that services supplied to a customer may be discontinued if he defaults in his payments. The reason for such a rule is that many lawsuits to collect small bills against scattered consumers could result if the remedy for collecting them was limited to actions at law. Steele v. Clinton Elec. Light & Power Co. 123 Conn. 180, 193 A. 613, 112 A. L. R. 232, and cases cited. See, also, Berner v. Interstate

---

[1]According to O'Connor's affidavit, the gas service was turned off at 10 a. m. March 5, and ordered reinstated at 1:30 p. m. that day. Siegel's affidavit states that the tenants were without gas for 24 hours.

Power Co. 244 Iowa 298, 57 N. W. (2d) 55, in line with this reasoning.

In State ex rel. Latshaw v. Board of Water & Light Commrs. 105 Minn. 472, 117 N. W. 827, this court upheld the right of a public utility to refuse service to a customer in arrears. In that case the utility board charged a net cash rate of 75¢ per 1,000 feet for gas furnished when payment was made by a given day, and 90¢ per 1,000 feet when payment was made afterwards. The customer neglected to pay on the due day but subsequently tendered the amount he owed calculated at 75¢ per 1,000 feet. Later he tendered a reasonable advance deposit for gas for which he was applying. The utility board rejected the tender unless the customer would first pay up all his arrears in the amount claimed by the utility. The customer sought by mandamus to compel the utility board to accept his deposit. The trial court discharged the writ. We held on appeal that under the city charter in that case the board was authorized to adopt a rule, with or without statutory authority, to the effect that gas would not be supplied to a delinquent person until that person's arrears for gas furnished had been paid. In this case, Minnegasco had adopted regulations providing, among other things, for discontinuance of service to a customer in default.[2]

The question presented in this case is whether the rule, recognized in the Latshaw opinion, is broad enough to support Minnegasco's refusal of service to plaintiffs under the circumstances here present. The rule urged by plaintiffs would permit the defaulting debtor to obtain indirectly the very thing the utility was privileged to deny him directly. Such a rule would encourage an unscrupulous tenant to default on his obligation to pay for service on the prospect that he could persuade his landlord, whenever termination is threatened, to obtain service on his own credit. We do not deem such a rule desirable, and it is our opinion that Minnegasco's privilege of termination ex-

---

[2] "11.02 The Company reserves the right to lock or remove a meter at any time for non-payment of gas accounts after final notice of such action has been given to the customer." See, also, 43 Am. Jur., Public Utilities and Services, § 64.

tended equally to Buckananga and the plaintiffs where it appears that Buckananga remained in default and also in possession of the premises benefited by the service sought. Eutaw Ice, Water & Power Co. v. McGee, 17 Ala. App. 18, 81 So. 354; Brass v. Rathbone, 153 N. Y. 435, 47 N. E. 905.

Plaintiffs contend that the trial court erred in granting summary judgment because there is a material fact in dispute. It is alleged that just prior to the termination of service plaintiffs entered into a revised rental agreement with Buckananga whereby they agreed to undertake the obligation of supplying gas to the rented premises. In view of our holding, we do not regard this to be a material fact.

Affirmed.