Therese M. SMITH, et al., Respondents,

v.

The CITY OF OWATONNA, Appellant.

No. C5–88–1789.

Court of Appeals of Minnesota.

May 2, 1989.

Review Granted July 12, 1989.

Stephen J. Smith, Joseph A. Bueltel, Smith & Tollefson, Owatonna, for respondents.

Corey J. Ayling, O'Connor & Hannan, Minneapolis, for appellant.

Heard, considered and decided by LANSING, P.J., and FOLEY and SCHUMACHER, JJ.

## OPINION

FOLEY, Judge.

The City of Owatonna appeals the trial court's judgment awarding respondents Therese M. Smith, William L. Cawley and Norma F. Cawley the cost of installing new natural gas service lines upon their properties, plus attorney fees incurred in prosecuting their action against the city. We affirm in part and reverse in part.

## FACTS

Natural gas is supplied to the Owatonna Public Utilities Commission (OPUC)[1] by Northern Natural Gas. The gas comes into the city through two so-called border stations, where the city takes control of the gas and then transports it underneath the streets of the city through city-owned gas mains. The gas pressure is about 250–350 pounds per square inch (psi) when received from Northern Natural Gas. Through the use of regulators, the city reduces the gas down to 50 pounds psi and then, in some instances, down to less than one pound psi in its underground mains.

Prior to 1980, most of the gas mains in the city operated at less than one pound psi, somewhere in the four to seven ounces psi range. Property owners who desired gas service were connected to the main lines by service, or feeder, lines which ran from the main line underground and directly into the improvements requiring gas service. The gas flow from the mains to each customer was not regulated, i.e., the gas came into each customer at somewhere between four to seven ounces psi, which is an appropriate pressure range for most gas operated appliances, such as furnaces, stoves and water heaters.

In the early 1980s, the city undertook to upgrade its gas mains from the low pressure four to seven ounces up to a high pressure of 50 pounds psi. One of the gas main upgrade projects was Main Street where the Smith and Cawley properties are located. The OPUC met in a regular session on July 9, 1984, to discuss the Main Street project. The next day the city engineer sent letters to all property owners on Main Street stating:

> In conjunction with the new street project on Main, you have been requested to install a new gas service or water service. * * * You will hire your own plumber to do the work. The City Contractor will saw the concrete at the location determined by your plumber and yourself. The City Contractor will also remove the existing curb and sidewalk.

> Your plumber will remove the concrete and replace the concrete in the street. No street opening permit fee will be charged but a permit will be required. The work should be coordinated with the City Contractor and * * * Engineering Inspector.

After receiving the letter from the city manager informing them to install new feeder lines, Smith and the Cawleys, along with other Main Street property owners, hired plumbers who installed those lines. The charge for Smith's installation was $948.07; the charge for the Cawleys' installation was $1,400. Other than one phone conversation with James Martin, the OPUC general manager, Smith and the Cawleys never made any attempt to question their obligation to provide service lines at their own expense, such as requesting a hearing, a meeting with Martin or another commissioner, or a written explanation.

In January 1986, by OPUC resolution, the city changed its policy of requiring property owners to pay the cost of laying service lines and connecting to gas mains. One reason for the change was that property owners had resisted paying for their own service line installation and, consequently, installation was often delayed. Secondly, the city decided it would be safer and generally more prudent for the city itself to oversee and inspect all service line installations rather than leave it up to individual property owners.

Smith and the Cawleys subsequently commenced this action in March 1986, more than 18 months after installing their service lines, demanding reimbursement for installation costs plus attorney fees. They claimed the city's abandonment of the existing low pressure main and installation of the new high pressure main rendered their service gas lines unusable, thus constituting a taking of property without just compensation in violation of the United States and Minnesota Constitutions. They also claimed the city denied them due process by not giving them adequate notice and opportunity to be heard. Finally, they

---

1. The Owatonna Public Utilities Commission is a city-owned and operated entity; therefore, the actions of the OPUC are referred to as the actions of the city itself.

claimed the city denied them equal protection because property owners on some other streets in the city did not have to bear the cost of installing their own new service lines. The due process and equal protection claims were prosecuted under 42 U.S.C. §§ 1981, 1983; therefore, Smith and the Cawleys sought recovery of reasonable attorney fees pursuant to 42 U.S.C. § 1988.

After a trial to the court, the trial court found the city's actions conferred no direct benefit on Smith and the Cawleys and accordingly concluded the actions constituted a taking of property without just compensation. The trial court further concluded that by not formally levying an assessment or establishing a hearing procedure, the city denied Smith and the Cawleys property without due process of law. Finally, the trial court concluded the city's decision to pay for some owners' service line installations and not for Smith and the Cawleys' was arbitrary and capricious, and thus denied them equal protection.

The trial court ordered judgment for Smith and the Cawleys for the amount they expended for installation plus reasonable attorney fees. The city moved for amended findings or a new trial. Along with its challenge of the trial court's determinations on the constitutional claims, the city argued the trial court erred in failing to disqualify Smith and the Cawleys' attorney because he testified as a witness and because he allegedly had a financial interest in the case. The trial court denied the city's motions and ordered a new judgment reflecting the principal amount of the claims plus the specific amount of attorney fees. The new judgment was entered and this appeal followed.

At oral argument, Smith and the Cawleys' counsel agreed this is not an inverse condemnation action, thus implicitly conceding there was no claim of taking without just compensation properly before the trial court. Consequently, we will address only the remaining issues raised by the city on appeal.

## ISSUES

1. Did the city deprive Smith and the Cawleys of their property without due process of law by failing to conduct a hearing after informing them it would be requiring them to install new gas service lines?

2. Did the city deny Smith and the Cawleys equal protection of the laws by requiring them, but not all other property owners, to bear the cost of installing new feeder lines?

3. Did Smith and the Cawleys' attorney's alleged financial interest in the outcome of the case so prejudice the city that a new trial should have been ordered?

4. Did Smith and the Cawleys' attorney's both testifying as a witness and appearing as an attorney so prejudice the city that a new trial should have been ordered?

## ANALYSIS

■ 1. Smith and the Cawleys' claim that they were denied property without due process of law is viable only if they in fact had a vested property interest in the city's provision of continuing gas service. We believe there is no such vested property right.

A landowner generally has an easement, i.e., a property right, to light, air, view and access to the property. Nichols, *Eminent Domain* § 5.14[1] (rev. 3d ed. 1985); *see also* Minn.Stat. § 160.08, subd. 4 (1984) (refers to "property rights, including rights of access, air, view, and light," which state may acquire for roadway purposes by purchase, gift or condemnation). In this case, the rights to light, air and view are not at issue; the only question concerns the extent of Smith and the Cawleys' access rights.

The right of access is generally understood as access to a highway or other public roadway, and we find no authority that this right of access extends to anything other than highways and roadways.

An owner of land has no private rights in the continued existence of any public work upon or near his land other than a highway. * * * No action lies when a state capitol or a college is moved away, when water pipes in the street are removed, or when a railroad or canal is

discontinued, provided the change is made by authority of law.

Nichols, *Eminent Domain,* § 6.11[3] (footnotes omitted).

The Kansas Supreme Court in 1903 addressed a situation similar to the case here where a municipality shut down an existing water main, thus denying property owners of water service. *See Asher v. Hutchinson Water, Light & Power Co.,* 66 Kan. 496, 71 P. 813 (1903). In that case the city contracted with a private utility to provide water service to its inhabitants. The plaintiff was a landowner who owned a stockyard which was served by a water main laid by the utility. After this water main had been in operation for some time, the city passed a resolution that this main should be removed and new mains constructed to serve other portions of the city instead. The landowner sought to enjoin the utility from digging up the main which served his property. The court held, however, the city was within its authority to decide where water mains should be laid and who should be served by them. The court explained:

> Water-works are public utilities. The power to own or otherwise provide a system of water-works, conferred upon cities, has relation to public purposes, and for the public, and appertains to the corporation in its political or governmental capacity. They are supported at public expense, and are subject to the exclusive control of the city in its governmental capacity, for the convenience, health and general welfare of the city. The city determines the amount of water-mains, where to be laid, and the number and location of fire-hydrants. Over these the individual has no control. In the exercise of this political power the city has discretion, with which the courts have no right to interfere.
>
> In such cases there is no contractual relation between the city and the individual upon which the principle contended for by plaintiff can rest. * * * *An individual can acquire no vested right, as against the public, in the continued service of a public utility.* Such a doctrine once admitted would destroy the

convenience as a public utility; it would then become hampered and subject to the control of the individual and made to subserve such interests, to the detriment of the public welfare.

*Id.* at 500–01, 71 P. at 814 (emphasis supplied).

We agree with the court in *Asher* that power to locate public utilities is within the exclusive province of the governmental entity controlling such utility. The individual has no vested right to any manner of service, and to give an individual such a right would indeed interfere with the government's ability to efficiently provide utility services for the general convenience, health and welfare of its citizens.

Even assuming *arguendo* that Smith and the Cawleys had vested rights to continuing gas service, we do not believe they were denied these alleged rights without due process of law. First of all, when a local governmental body takes an action affecting an open class of individuals' interests or situations, it is acting in its legislative capacity, and procedural due process protections are minimal. *Barton Contracting Co., Inc. v. City of Afton,* 268 N.W.2d 712, 715–716 (Minn.1978). In this case, the city's decision to lay the high pressure main affected property owners on a two block stretch of Main Street, and as such affected an open class of individuals. Consequently, the city's action was legislative and Smith and the Cawleys' minimal rights to due process were not denied.

Secondly, even if the city's decision were deemed quasi-judicial rather than legislative, Smith and the Cawleys' only entitlement would have been to contest this decision "at a meaningful time and in a meaningful manner." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 437, 102 S.Ct. 1148, 1159, 71 L.Ed.2d 265 (1982) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). The standard courts use to determine the amount of process due is to weigh the individual's interest in procedural safeguards which minimize chances of unfairness or mistakes against the government's

interest in minimizing the cost of enforcing regulations. *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976).

The gist of Smith and the Cawleys' due process claim is that their relief is post-deprivation rather than pre-deprivation. Smith and the Cawleys' damages were purely financial in nature and relatively minor. We see no compelling reason, as there would be, for instance, when public assistance benefits are terminated, for the city to have provided Smith and the Cawleys pre-deprivation relief. To require the city to grant each disgruntled property owner a hearing prior to making public improvements would wreak havoc with construction schedules and essentially prevent the city from timely repairing and upgrading its utility services. Smith and the Cawleys were given due process to the extent they were able to bring this tort action for money damages. Furthermore, even if Smith and the Cawleys were entitled to a pre-deprivation hearing, they waived that right by not timely requesting a hearing, but instead making the improvements and waiting a year and one-half to bring this action.

■ 2. Both the federal and state constitutions require persons similarly situated be treated alike in the law. *In re Harhut*, 385 N.W.2d 305 (Minn.1986). Unless there is a suspect classification involved, classifications of persons will be sustained under the equal protection clause if rationally related to a legitimate state interest. *Id.* at 310. The rational basis test is a two-part analysis; first, does the classification have a legitimate purpose and second, was it reasonable for the governing body to believe the use of the classification would promote that purpose? *Id.* at 311. The person challenging the classification must establish the unconstitutionality beyond a reasonable doubt. *Id.*

■ There were six projects the trial court considered in coming to its conclusion that the city's actions were without rational basis. Two of those projects, the Main Street and Bridge Street projects, involved conversion from low to high pressure mains where the landowners were required to install new regulators and new high pressure service lines. Smith and the Cawleys claim there is no rational basis for distinguishing between these two projects and the other four projects, which are discussed in turn below.

*Broadway.* This project involved the laying of new low pressure mains along Broadway. The owners did not have to install regulators, but they did have to pay for installation of new low pressure service lines. The distinction between the project affecting Smith and the Cawleys' property, therefore, is that they were required to install regulators.

Regulators are only necessary when incoming high pressure gas must be reduced to low pressure; they are not necessary when the incoming gas pressure is already low. The city's rationale for not installing high pressure mains on Broadway was that Broadway was not at that time close enough to a high pressure system to make it economically feasible to lay several blocks of new pipe to connect Broadway to the existing high pressure system.

*North Cedar Avenue.* This project was essentially the same as Broadway. New low pressure mains were installed, owners were required to replace their own service lines, and no regulators were required. The city gave the same rationale for laying low pressure mains on North Cedar that it did for the Broadway project.

*School Street.* School Street involved conversion from low to the high pressure mains. New regulators were therefore required as were new high pressure service lines. In contrast to the Main and Bridge Street projects, however, the city, rather than the owners, paid for these new regulators and service lines. The city gave as its rationale that it was testing the utility and practicability of a new polyvinylchloride (PVC) pipe. None of the plumbers working within the city's limits were certified on PVC pipe; therefore, the city used this project as an opportunity to certify the plumbers so they could lay PVC pipe in the future. Because this was an experimental project which served as training for persons installing the pipe, the city decided it

was inappropriate to charge the property owners for services.

*Grove Street.* Like the Main, Bridge and School Street projects, Grove Street also involved conversion from a low to high pressure main, with installation of new regulators and high pressure service lines. Again, however, the city paid for the regulators and service lines. The Grove Street project was commenced after the city had legislatively changed its policy requiring owners to install their own lines. Therefore, the owners on Grove Street received the benefit of city-paid installation.

In applying the *Harhut* two-part equal protection analysis, it appears to us that the city articulated legitimate governmental purposes for its classifications, and that it was indeed reasonable for the city to believe the classifications would serve those purposes. As to the Broadway and North Cedar Avenue projects, the city determined it was economically unfeasible to lay high pressure mains because those streets were too far away from existing high pressure mains. As to the School Street project, the certification of local plumbers is also a legitimate governmental purpose. Finally, as to the Grove Street project, the city had made a prior legislative decision to provide all property owners a benefit which it had not in the past. The fact that Smith and the Cawleys had already installed their service lines, and thus did not benefit from this legislative change, does not give rise to an equal protection claim.

If such a legislative change were to give rise to an equal protection claim, then anytime a governmental body provided new services to its citizens it would be subject to equal protection claims from citizens who paid for those services prior to the change. It is well established that a governmental body may by legislative action "implement programs piecemeal and delay total elimination of a perceived evil until a future date." *Insurers' Action Council,*

*Inc. v. Heaton,* 423 F.Supp. 921, 926 (D.Minn.1976) (citing *Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955)). In conclusion, therefore, we hold that Smith and the Cawleys did not establish the unconstitutionality of the city's actions beyond a reasonable doubt. *See Harhut,* 385 N.W.2d at 311.

■ 3. Minn.R.Prof.Conduct 1.8(j) provides:

A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may: (1) acquire a lien granted by law to secure the lawyer's fee or expenses; and (2) contract with the client for a reasonable contingent fee in a civil case.

When the action was commenced, Smith and the Cawleys' attorney, Stephen Smith, was acting as personal representative for the estate of his deceased father, John Smith, who had owned the real property involved in this action prior to his death. The attorney stated in an affidavit that, although he was a beneficiary under one of the alternative trusts in his father's will, the family had decided that all of the property in his father's estate would go to his mother. Thus, he claimed, he had no proprietary interest in the cause of action because any benefit derived by the estate would be realized by his mother and not by himself.

The city produced no evidence contradicting or otherwise challenging the attorney's assertion that he had no financial interest in his father's estate; therefore, the trial court was within its discretion in refusing to disqualify him and did not err in denying the city's motion for a new trial.[2]

■ 4. Minn.R.Prof.Conduct 3.7 provides:

A lawyer shall not act as an advocate at a trial in which the lawyer or a lawyer

---

**2.** After the trial court's first order for judgment in this case, but before the motion for new trial was heard, all the assets in John Smith's estate were distributed to his wife, respondent Therese Smith. Consequently, the case name was amended to substitute Therese Smith for the estate of John Smith.

in the firm is likely to be a necessary witness, except where:

(a) the testimony relates to an uncontested issue;

(b) the testimony relates to the nature and value of legal services rendered in the case;

(c) disqualification of the lawyer would work substantial hardship on the client; or

(d) the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

In this case, the attorney's testimony falls within exceptions a, c and d. He testified primarily that he was familiar with the property, that the pipes and regulators were required by the city, and that he, as personal representative, paid for such installation. These were all uncontested issues and solely matters of formality. In addition, his disqualification would have worked a substantial hardship because the city did not move to disqualify him until the week of trial, even though the city's attorney knew about the potential problem well in advance of trial and were specifically asked by Smith and the Cawleys' attorney to give him notice if they were going to object to his testifying.

The primary reason for Rule 3.7, and the sole reason asserted by the city at trial for disqualifying the attorney, is that the finder of fact may not understand whether a statement by an advocate/witness should be taken as proof or as an analysis of the proof. *See* Minn.R.Prof.Conduct 3.7, comment. The city asserted that it did not want the attorney on the witness stand interspersing his argument with his testimony, thus muddying the facts of the case.

In response to the city's request, the trial court required the attorney's partner to examine him so that it would be clear when the attorney was acting as a witness and when he was acting as an advocate. Given the fact that the city knew the attorney would be called as a witness and made no timely objection thereto, and that the trial court responded to its request by having

the attorney's partner examine him, the trial court was within its discretion in allowing him to testify.

## DECISION

The trial court did not err in denying the city's motion for a new trial on the basis of alleged professional conduct violations. The trial court did err, however, in ruling that the city's actions constituted a taking without just compensation, a denial of property without due process and a denial of equal protection. We therefore reverse the trial court's judgment and direct entry of judgment in favor of the city dismissing the complaint.

Affirmed in part and reversed in part with directions to proceed in accordance with this opinion.

SCHUMACHER, Judge, dissenting.

I respectfully dissent. I believe the city had no rational basis for requiring some, but not all, property owners to install their own gas service lines; therefore, the city's actions denied respondents equal protection.

The sole evidence presented by the city to justify its actions was the testimony of the OPUC general manager, Dave Martin. As a city employee, and a person intimately involved in all the projects in question in this case, Martin was certainly an interested party and his testimony was suspect. *See Rohling v. American Family Mutual Insurance Co.*, 309 Minn. 258, 260, 243 N.W.2d 742, 743 (1976). The trial court was not required to believe his purportedly expert testimony, *see Rud v. Flood*, 385 N.W.2d 357, 360 (Minn.Ct.App.1986), and it is obvious that it did not. This court should thus defer to the trial court's assessment of Martin's credibility.

Furthermore, after a thorough review of the record, I am also convinced, as was the trial court, that Martin's attempts to explain the city's disparate treatment of property owners amount to no more than after-the-fact rationalizations for a haphazardly run construction project. First of all, when asked by respondents in 1984 why they had

to install their own service lines, the city could give no explanation. Despite discovery requests, the city was still unable to provide any explanation until less than a week before trial when it served respondents with late supplemental answers to interrogatories.

Secondly, this was truly one long-term project to improve gas service, not a series of individual street improvements. There is no justification for the city's changing its treatment of property owners from month to month as each new segment of pipe main was laid. Although I cannot with full conviction say the city was required to provide each objecting property owner a public hearing, had the city in fact held any hearings at all, the equal protection violations would have been revealed and most likely prevented. As it turned out, it took years of individual complaints, including respondents', before the city finally took action to halt this disparate treatment of property owners by resolving to pay for all, not just selected, gas service line installations.

As a final matter, I would acknowledge there is no authority expressly holding that a property owner in Minnesota has a vested property interest in continuation of gas service. Such a right must either be created by the legislature or recognized by our supreme court. Nonetheless, gas service is an essential need for Minnesota citizens, and both the Minnesota Legislature and Public Utilities Commission have acknowledged that any interruption of service is always a matter of utmost seriousness. *See, e.g.,* Minn.Stat. § 504.26 (1988) (assesses treble damages against landlord who causes interruption of tenant's utility service); Minn. R. 7820.1600, subpt. 2, 7820.-1800 (1987) (prohibits utility from shutting off service during cold weather months, October 15 through April 15). As such, I believe the time is ripe to recognize that a property owner has a vested property interest in continuing gas service and that any interruption of service may constitute a compensable taking.