Therese M. SMITH, et al.,
Petitioners, Appellants,

v.

The CITY OF OWATONNA,
Respondent.

No. C5–88–1789.

Supreme Court of Minnesota.

Jan. 19, 1990.

Rehearing Denied March 26, 1990.

Stephen J. Smith, Tracy M. Smith, Smith & Tollefson, Owatonna, for appellants.

Corey J. Ayling, Minneapolis, for respondent.

Hubert H. Humphrey, III, Atty. Gen., Dennis D. Ahlers, Sp. Asst. Atty. Gen., St. Paul, for amicus curiae State of Minn.

Jocelyn F. Olson, Asst. Atty. Gen., St. Paul, for amicus curiae Dept. of Public Service.

Legal Aid Soc. of Minneapolis, Inc., Minneapolis, for amicus curiae Energy Sense Coalition.

SIMONETT, Justice.

Plaintiff property owners, in this appeal, raise constitutional challenges to the municipally-owned utility's actions in requiring them to pay the cost of installing service lines to connect to the city's new replacement gas mains.

Beginning in 1980 the City of Owatonna, by its Public Utilities Commission, began a program of upgrading only low pressure gas mains. On two streets the old mains were replaced with new low pressure gas mains. Next, in 1984, the old low pressure mains on Main Street were replaced with high pressure mains. The property owners on Main Street, including the plaintiffs here, received a letter from the city engineer advising them that they would be responsible, at their own expense, for hiring a plumber and installing the service line from their properties to the new high pressure main. Property owners on the previous projects had also been required to pay for their service lines, but the high pressure line involved the additional expense of installing a pressure reducing regulator and meter on the outside of the buildings. Pursuant to the city's directive, plaintiff Therese M. Smith installed the new service line and regulator at a cost of $948.07, and plaintiffs William and Norma Cawley did the same for their property at a cost of $1,400.

A year later, in 1985, the Commission installed new · high pressure mains on School Street but the City, not the property owners, paid for the service lines and regulators. The Commission explained it was absorbing this expense because it was experimenting with plastic piping and wanted to certify its own installers to use the new product.

In July 1985 plaintiffs commenced this lawsuit against the City claiming that its action in compelling them to abandon their old yet adequate low pressure service lines and to install a new high pressure service line at their own expense violated their constitutional rights under the federal and state constitutions. They claimed (a) a deprivation of property without due process; (b) a "taking" without just compensation; and (c) a denial of equal protection.

Prodded by the lawsuit and the foot-dragging of other complaining property owners, the City, in 1986, changed its policy. It elected thereafter to pay the cost of replacing all service lines. Later that year, the City paid the cost of service lines to a new high pressure main replacement on Grove Street.

The trial court found that the previously existing low pressure gas main on Main Street had been adequate to meet the needs of the properties involved. The court also found the new high pressure mains afforded certain operational advantages to the Commission and perhaps to the City as a whole, although they conferred no direct benefit to plaintiffs. The trial court ruled that plaintiffs had been denied procedural due process; that requiring plaintiffs to pay the cost of their service lines was arbitrary and capricious; and that plaintiffs had been deprived of a "property interest in their respective gas services" without just compensation. The trial court awarded Therese M. Smith $948.07 and the Cawleys $1,400, plus attorney fees.

On appeal, the court of appeals (2–to–1) reversed, ruling that plaintiffs were not entitled to recover on any of the three theories they asserted. *Smith v. City of Owatonna*, 439 N.W.2d 36 (Minn.App. 1989). We granted plaintiffs' petition for further review. We also granted the State of Minnesota and its Department of Public Service and the Energy Cents Coalition leave to file amicus briefs.

## I.

The first issue is whether plaintiffs were deprived of a property interest without due process. We think not.

The threshold (and dispositive) question is whether plaintiffs have a "property interest" entitled to due process protection. The United States Supreme Court has eliminated the distinction between property and privilege. The test whether a person has asserted a property right is whether the plaintiff has asserted a legitimate claim of entitlement to a government benefit. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). *See Snyder v. City of Minneapolis*, 441 N.W.2d 781, 791 (Minn.1989). The source of entitlements, *i.e.*, property rights protected by due process standards, is state or federal law: "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.

Thus in *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 11–12, 98 S.Ct. 1554, 1561, 56 L.Ed.2d 30 (1978), because Tennessee's decisional law indicated that gas and electric services could only be terminated for just cause, the United States Supreme Court held that the plaintiffs had an entitlement interest protected by due process standards. Before service to a customer could be discontinued for nonpayment of a bill, due process required notice of how to challenge the bill and an opportunity for a predeprivation hearing on the past due charges. *Id.* at 14–15, 18, 98 S.Ct. at 1562–63, 1564.

Our state law, too, affords protection to utility customers to whom service is denied or threatened with disconnection. In *Cascade Motor Hotel, Inc. v. City of Duluth*, 348 N.W.2d 84, 85 (Minn.1984), we held unenforceable a Duluth ordinance requiring new applicants for utility services to pay the past due bills of the former owner of the premises. *See also, e.g., Siegel v. Minneapolis Gas Co.*, 271 Minn. 127, 129, 135 N.W.2d 60, 62 (1965) (utility company may adopt regulations for terminating service to customers in default, implying services cannot be terminated without a reason). Thus, Judge Diana Murphy in *Freeman v. Hayek*, 635 F.Supp. 178, 182–83 (D.Minn.1986), construing our case law, held that Minnesota users of water and sewage utilities had "a legitimate claim of entitlement at least equivalent to that of the plaintiffs in [*Craft*]." *Accord Lamb v. Hamblin*, 57 F.R.D. 58, 61 (D.Minn.1972) (Judge Edward Devitt). Our statutory law also,[1] as well as rules promulgated by the Public Utilities Commission,[2] reflect our state's concern that utility services, generally, may not be discontinued without good cause. Plainly this "entitlement" applies to municipally-owned utilities.

In this case plaintiffs have asserted a property right to "continued gas service." But their claim is not like the entitlement claim of the Tennessee customers in *Craft*. The City of Owatonna is not terminating gas service to plaintiffs' properties or refusing service.[3] Rather it is implementing a change in the method of delivery of that service. "Whether a consumer has a protected interest in the intangible property of continued service," points out amicus Energy Cents Coalition, "is separate and distinct from whether the consumer has a

---

1. *See, e.g.,* Minn.Stat. § 504.185 (1988) (tenant can have utility service reconnected if discontinued due to landlord's failure to pay); Minn.Stat. § 325E.025 (1988) (utility cannot condition service on payment of previous customer's bill).

2. Minn.R. §§ 7820.1000–3000 (1989) (prohibiting, with limited exceptions, termination of utility services by private utilities without notice and cause). These rules, however, do not apply to municipally-owned utilities. Minn.Stat. § 216B.02, subd. 4 (1988).

3. Granted gas service is cut off briefly, for a few hours, while the change-over from the old low pressure to the new high pressure mains is made. While this minor interruption may require notice to the property owners, this notice was given. Indeed, plaintiffs helped coordinate the change to the new system.

vested property interest in the precise manner in which that service is delivered."

Plaintiffs argue they were given an impossible choice by the city: Either install a new service line or be without gas service. If they had not spent the money to install a new feeder line, plaintiffs argue, they would have been without service, a situation not unlike the customer threatened with discontinuance of service for an unpaid bill. To describe the consequences of the City's action, however, does not define nor identify the "property interest" that it is claimed to have caused these consequences.

What plaintiffs are claiming here is not an entitlement to the benefit of continued gas service. That right is not disputed. Nor is plaintiffs' right to connect to the City's mains questioned. Rather plaintiffs claim a right created by state law to continue to hook up to the old gas main on Main Street. They claim an entitlement to the benefit of the continued use of the existing low pressure main. We are aware of no state law that gives landowners such a right. Rather, the law has entrusted the City with the right and responsibility to decide when and in what manner its gas distribution system shall be repaired or upgraded. Minn.Stat. ch. 453A (1988); cf. *Johnson v. City of Plymouth*, 263 N.W.2d 603, 606 (Minn.1978) ("the implementation of any improvement project on a public thoroughfare is undertaken in the interest of the public safety and welfare pursuant to inherent governmental police powers.") As the court of appeals observed, "to give an individual [a right to a particular manner of service] would indeed interfere with the government's ability to efficiently provide utility services for the general convenience, health and welfare of its citizens." *Smith*, 439 N.W.2d at 40.[4]

In some ways, plaintiffs are in a position similar to the plaintiffs in *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980).

There it was held that nursing home residents entitled to Medicare and Medicaid benefits were not entitled to a hearing before the government could decertify their nursing home's certification as a Medicare and Medicaid qualified institution. While statutes and regulations gave the residents a right to continued medical benefits, they did not confer on the residents a right to continued residence in a particular institution, if that institution did not meet government standards. In *O'Bannon*, admittedly, the government's action was directed against a third party (the nursing home). Even so, plaintiffs' claim of entitlement here to the continued use of the existing gas distribution system seems little different from the nursing home residents in *O'Bannon* claiming entitlement to continued use of their old home.

In effect, plaintiffs argue the existing low pressure mains on Main Street were adequate and did not need replacement. Indeed, the trial court found that the old main was adequate. But the trial court also found that the new high pressure mains had operational advantages beneficial to the City as a whole, see Part III, *infra*, and there was testimony that the old main and service lines were reaching their useful life span. We believe the City's decision to upgrade its gas distribution system was a policy decision, predominantly legislative in character, which, at least in this instance, does not lend itself to judicial intrusion. Assuming arguendo plaintiffs should have had an opportunity to dispute the City's decision to upgrade its gas mains, due process would not require predeprivation hearings for each property owner. The opportunity of property owners to appear at the public meetings of the Commission to protest, or the post-deprivation remedy of a lawsuit (such as plaintiffs have done), suffices for the minimal due process considerations required for the legislative action involved in this instance.

---

4. Amici have expressed concern that some language in the court of appeals' opinion might be construed to suggest a utility customer had no right to "continued service." We do not think the appeals panel said this nor intended to say it. Indeed, the panel made clear it was stating only that a customer had no right to "any *manner* of service." *Smith*, 439 N.W.2d at 40 (emphasis added).

*See, e.g., In re Christenson,* 417 N.W.2d 607, 613 (Minn.1987).

We hold plaintiffs do not have an entitlement under state law to the continued use of a particular means of delivering gas service; and, therefore, the City's failure to afford plaintiffs a hearing before implementing changes in the delivery system is not a violation of due process standards under either the federal or state constitutions. This holding in no way detracts from our decisional and statutory law which establishes a legitimate entitlement to continued gas service; in other words, an individual has a valid due process claim if a municipally-owned utility would cut off service without notice first and an opportunity to be heard.

## II.

Plaintiffs next contend the City's actions give rise to an inverse condemnation claim for a regulatory taking of property without just compensation. We disagree.

■ Plaintiffs must first prove their "property" has been taken, destroyed or damaged. The property interest involved in eminent domain is something more than the claim of entitlement to a government benefit, which is all the "property interest" needed for a procedural due process claim. For a condemnation claim, among other things, there must be "property" which suffers a measurable diminution in market value. *Alevizos v. Metropolitan Airport Com'n,* 298 Minn. 471, 487, 216 N.W.2d 651, 662 (1974). Here plaintiffs suggest that the property taken is either "the right to continued gas service, the effective condemnation of the old service, or the deprivation of the money expended to replace the service * * *."

■ As we have already seen, the right to "continued gas service" is not involved here. Neither, under the circumstances, do we think the resultant obsolescence of plaintiffs' old service line by reason of the City's installation of a new main constitutes a taking. Finally, the cost of installing a new service line is just that, the incurring of an expense, not a property loss

or diminution in value in the eminent domain sense. Everyone seems to agree that plaintiffs' old service lines under Main Street are plaintiffs' property. The question, however, is whether the City has impaired a property interest of plaintiffs which is legally cognizable, such as an easement or contract with the City, which gives plaintiffs the right to use their pipes in a certain way, specifically, to be connected to certain mains which cannot be changed without the landowners' consent. Plaintiffs have shown no such property interest.

Somewhat analogous is *Stillwater Water Co. v. City of Stillwater,* 50 Minn. 498, 52 N.W. 893 (1892). There a private water company was given the right to place its water pipes in the public streets. Later the city re-established a lower grade on some of the streets necessitating the water company to lower and re-lay its pipes. We held that the plaintiff's right to lay pipes in the street was subordinate to the city's power to grade the streets, "and although the exercise of the power may at times cause plaintiff inconvenience and expense, that is nothing more than it took the risk of in accepting the grant." 50 Minn. at 503, 52 N.W. at 894. *See also New Orleans Gas Co. v. Drainage Comm'n,* 197 U.S. 453, 461, 25 S.Ct. 471, 473, 49 L.Ed. 831 (1905) (if a gas company is required at its own expense to change the location of its pipes in the public street when the city installs a drainage system, "none of the property of the gas company has been taken").

In this case, plaintiffs had a license (or, arguably, even an implied easement) from the City to lay their service line in Main Street. J. Sackman, *2 Nichols' The Law of Eminent Domain,* § 5.49 (3d ed.1989). There is no claim this license gives plaintiffs the right to dictate the gas main that the City must use. The tail cannot wag the dog. The property owners install their service lines subject to the condition that they may have to be changed when the gas mains are changed. This arrangement not only does not create a property right for eminent domain purposes, but defeats it.

### III.

■■ "The equal protection clauses of the federal and state constitutions require that all persons similarly situated be treated alike under the law." *In re Harhut,* 385 N.W.2d 305, 310 (Minn.1986). Plaintiffs claim this did not happen here.

Plaintiffs point out: (1) only some gas mains were replaced with high pressure systems; (2) some part of Main Street remained on low pressure; (3) the property owners on School Street did not have to pay for the installation of their high pressure service lines or meters; and (4) neither did the property owners on Grove Street have to pay for their service line installations, which were installed after the City changed its policy.

In general, economic legislation involving classification of similarly situated individuals will be upheld under the equal protection clause if it is rationally related to a legitimate state purpose. *Id.* Unconstitutionality must be proven beyond a reasonable doubt. *Id.* at 311.

Owatonna takes control of its gas at two border stations, reducing the gas from 250–300 pounds pressure per square inch to 50 pounds. At certain points along the mains, the gas had been further reduced to under 1 pound per square inch. Under this low pressure system, individual properties acquire gas through service lines, one regulator reducing the pressure for a number of properties. On the other hand, a high pressure system requires a regulator at each point of service. A high pressure system is safer than a low pressure system because it is easier to regulate the pressure in the lines as each customer receives gas. In a low pressure system, property closest to the regulator may have too much pressure and those further away may have too little. Either condition is dangerous. Modern high efficiency appliances function better on a high pressure system which distributes the gas evenly.

The differences in installation on the different streets was shown to have a rational basis. Some mains were "too far from a high pressure system" to justify using new high pressure mains. Only the high pressure system required individual regulators. As to the School Street project, the City was experimenting with a new type of plastic pipe which accounted for the City absorbing the service installation expense. As to the installation of the high pressure mains on the Grove Street project after the lawsuit was started, the Commission by then had changed its policy.

As the court of appeals noted, the fact that the policy change was not applied retroactively does not give rise to an equal protection claim. "Merely because the legislature sees fit to change the law does not give rise to an equal protection attack on those who, at some previous time, did not have the benefit of the new statute." *Lee v. Pavkovic,* 119 Ill.App.3d 439, 447, 74 Ill.Dec. 900, 906, 456 N.E.2d 621, 627 (1983). If this were not so, then, as the court of appeals in this case observed, "anytime a governmental body provided new services to its citizens it would be subject to equal protection claims from citizens who paid for those services prior to the change." *Smith,* 439 N.W.2d at 42.

We can appreciate plaintiffs' frustration. Plaintiffs concede they can be required to pay the cost of new service lines if new service lines are needed and if the cost is fairly assigned. They question the need and they question the manner in which the costs were assigned. While the manner in which the City and its Commission went about its business may show a lack of political astuteness, the City's actions do not rise to the level of a constitutional violation.

Affirmed.

YETKA, Justice (dissenting).

I dissent. I disagree with the majority's conclusion that the petitioners did not have a property interest in the gas service lines that entitles them to due process and just compensation. The majority rationalizes this conclusion by relying on a remark snatched from oblivion by the court of appeals out of a 1903 Kansas case, *Asher v. Hutchinson Water, Light & Power Co.,* 66 Kan. 496, 71 P. 813 (1903), as authority for the proposition that a landowner has no

vested interest in any *manner* of utility service. *See Smith v. City of Owatonna,* 439 N.W.2d 36, 40 (Minn.App.1989). This case is not about the manner in which utility service is provided; it is about the manner in which a local government may force citizens to bear public burdens.

Although the majority characterizes the city's action as an exercise of police power, all the evidence leads to the conclusion that the city was acting solely to up-grade the gas delivery system in order to provide a generalized benefit to the Owatonna Public Utilities Commission [1] as an enterprise. In *Lachtman v. Houghton,* 134 Minn. 226, 229, 158 N.W. 1017, 1018 (1916), this court defined the term "police power" as the power to impose restrictions on private rights as are necessary to prevent the infliction of public injury. In discussing the limits of the police power, we said:

> The police power of the state is very broad, but not without limits. \* \* \* when the legislative power attempts to forbid the owner from making a use of his property which is not harmful to the public and does not interfere with the rightful use and enjoyment of their own property by others, it invades property rights secured to the owner by both the state and federal Constitutions. Only such use of property as may produce injurious consequences, or infringe the lawful rights of others, can be prohibited without violating the constitutional provisions that the owner shall not be deprived of his property without due process of law nor without compensation therefor first paid or secured.

*Id.* at 237, 158 N.W. at 1021–22.

There was no specific safety, health, or welfare concern present in this case. This was not police power action; it was merely the city acting as an enterprise. In *Johnson v. City of Plymouth,* 263 N.W.2d 603 (Minn.1978), we recognized that a police power regulation can also effect a taking and that ending the analysis after labeling a city's action as police power is merely a convenient way to avoid the real issues in these cases. *See id.* at 606–08. That is what the majority is doing here.

In the instant case, the individual property owners in the City of Owatonna had historically been responsible for maintenance and repair of the service lines running from the gas main to their buildings. Where a property owner has not paid for a benefit provided by the city, he probably does not have a right to complain when it is taken away without compensation. *See J. Sackman, 2 Nichols' The Law of Eminent Domain,* § 6.13 (3d ed.1989) (citing *Stanwood v. Malden,* 157 Mass. 17, 18, 31 N.E. 702, 703 (1892) (Holmes, J.)). When, however, a landowner is assessed for the improvement when a gasline is first installed or forced to pay for maintenance or repairs during its useful life, the landowner has a legitimate complaint when the line is rendered useless by city action and landowner is not allowed to recover any part of the money the landowner has been compelled to pay. This is especially true where, as in this case, the trial court found that there was no direct benefit conferred to the petitioners. If, for example, the City of Owatonna now decides to install another "new and improved" gas main and again orders the petitioners to remove and replace, at their own expense, the gaslines they paid to have installed in 1985, it is easy to see that they would be deprived of a property interest, namely, the equitable interest they acquired when they bought and paid for the installation of the lines in 1985. As noted by the majority, everyone seems to agree that petitioners owned the old service lines. Given that the petitioners have some sort of ownership interest in the lines, the only remaining questions are whether they are entitled to (1) just compensation for a "taking;" or (2) due process.

(1) *Just Compensation for a "Taking"*

This court has recognized less tangible property rights in the analogous situation of highway access. The early highway access cases denied compensation on the *Ash-*

---

**1.** The Owatonna Public Utilities Commission (OPUC) is a city-owned and operated entity; accordingly, the actions of the OPUC are herein-after referred to as actions of the City of Owatonna itself.

er-like theory that "a property owner has no vested interest in the continued flow of the main stream of through traffic." *See Hendrickson v. State*, 267 Minn. 436, 442, 127 N.W.2d 165, 170 (1964). In *Hendrickson*, however, we rejected this outdated approach as to abutting owners and reasoned that a property right to access should be recognized because of a number of sound factors, including the fact that, in some cases, the roadway was built with taxes and assessments paid by the abutting owners. *Id.* at 442–43, 127 N.W.2d at 170–71. In *Hendrickson*, we also resisted the temptation to avoid the taking issue by characterizing the government's decision to impair the plaintiff's access to the highway as a police action. *See Hendrickson*, 267 Minn. at 441–42, 127 N.W.2d at 170. In *Alevizos v. Metropolitan Airport Commission of Minneapolis and St. Paul*, 298 Minn. 471, 216 N.W.2d 651 (1974), we said:

> Any statement of what constitutes "property" can only be nebulous at best. * * * Property is more than the physical thing—it involves the group of rights inhering in a citizen's relation to the physical thing. Traditionally, that group of rights has included the rights to possess, use, and dispose of property.

*Id.* at 485, 216 N.W.2d at 661 (footnote omitted).

In a climate such as Minnesota's, access to natural gas for heating is as essential to the reasonable use of commercial property as access to a highway. By depriving a property owner access to the municipal gas mains, a city effectively deprives the property owner of the right to use his or her property. Accordingly, we should recognize that the petitioners have a compensable property interest in the gaslines that were, in effect, taken when the city decided to switch to a high pressure gas main on the portion of Main Street which abutted the petitioners' land.

The majority suggests that, even if the old lines were taken, the petitioners suffered no legally cognizable damage when the old lines were rendered useless by the installation of the high pressure main. The measure of damages in a case like this is the difference between the market value of the property before and after the taking. *Alevizos*, 298 Minn. at 487–88, 216 N.W.2d at 662; *see also Hendrickson*, 267 Minn. at 446, 127 N.W.2d at 173. The valuation of property which has been taken must be calculated as of the time of the taking. *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 320, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987). A hypothetical sale scenario makes it is easy to see that the value of petitioners' property was diminished. Suppose that, instead of making the required expenditures under protest as they did, petitioners had decided to sell their property. If one of the parcels was worth $100,000 with a functioning natural gasline, it is logical to conclude that it would be worth less with a disconnected gasline. If it were known that the gas service could be restored by paying $1,500 for new gaslines, surely, a hypothetical buyer would discount his or her purchase offer by at least that amount. The fact that the petitioners attempted to mitigate their damages by paying, under protest, for the required improvements does not change this analysis. The issue of waiver was litigated below, and the trial court obviously concluded there was no waiver. The record contains no evidence that this conclusion was erroneous. Consequently, I would hold that the petitioners are entitled to the damages awarded by the trial court.

*(2) Due Process Analysis*

In order to establish a right to due process, petitioners must prove that they have a "legitimate claim of entitlement" to a property interest.[2] *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). These property interests are determined by state law. *See Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 9, 98 S.Ct. 1554,

**2.** There is no question in this case that the city acted under color of state law and is, therefore, subject to 42 U.S.C. § 1983.

1560, 56 L.Ed.2d 30 (1978). In the recent case of *Freeman v. Hayek,* 635 F.Supp. 178 (D.Minn.1986), the court articulated sound reasons why we should recognize such a property interest in a right to continued utility service. *Id.* at 182–83. In the present case, the city threatened to and did shut off the gas. The petitioners only avoided a complete deprivation of gas service by paying the contested charges under protest. Amazingly, at oral argument before this court, counsel for the City of Owatonna asserted that petitioners would have received due process if they had simply refused to comply with the city's order. The city's counsel conceded that if the petitioners had refused to comply, the city would have ordered and paid for the improvements and commenced special assessment or similar proceedings in order to recover the charges. The notion that a person who pays a contested charge under protest is somehow less entitled to be heard than a person who simply refuses to pay is obviously absurd. I believe the city should have conducted some type of special assessment hearing before ordering the petitioners to install the new service lines at their own expense.

Even if the petitioners did not have a legally cognizable property interest in the lines, they unquestionably had a legally cognizable property interest in the money of which they were deprived when they were forced to pay for the new service lines. The fifth amendment's just compensation provision is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *First English,* 482 U.S. at 318–19 (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)).

A special assessment is a taking to the extent that the amount assessed exceeds the special benefit conferred upon the property. E. McQuillin, 14 *Municipal Corporations* § 38.02 (3d ed.1987). In this case, the trial court found that there was no special benefit conferred upon petitioners' property; therefore, this was a taking. I believe the city's action in this case amounts to a de facto special assessment and, as such, should be subject to the procedural mandates of Minn.Stat. ch. 429 (1988) (local improvements, special assessments).

It is unclear as to where the city got the authority to order the petitioners to install the new lines. As noted above, this is not police power because this was a city-wide project, and there was no specific health or safety concern. A municipality, absent an express or implied grant of power from the legislature or the constitution, does not have the power to levy special assessments for local improvements. E. McQuillin, 14 *Municipal Corporations* § 38.06 (3d ed. 1987). Minn.Stat. ch. 453A (1988) (municipal gas distribution) authorizes certain cities to acquire private property by condemnation and the exercise of the power of eminent domain in accordance with Minn. Stat. ch. 117 (1988). *See* Minn.Stat. §§ 453A.02, subd. 3, 453A.06. In this case, the city did not act in accordance with chapter 117. Although Minn.Stat. ch. 429 does not explicitly authorize the type of action taken by the city in this case, it may be considered an implied grant of such authority. If the city's action is not deemed to be a special assessment, it should be invalidated altogether as *ultra vires.*

Due process requires that a property owner be given reasonable notice and hearing *before* his property is subjected to the lien of a special assessment. *Meadowbrook Manor, Inc. v. City of St. Louis Park,* 258 Minn. 266, 270, 104 N.W.2d 540, 543 (1960). In the present case, the petitioners should have been given an opportunity to question the validity of the city's action before being required to install new gaslines under the threat of having their gas disconnected. If the city would have held a public hearing like that mandated by Minn.Stat. § 429.031 (1988), it is likely that it would have encountered at the outset the opposition that ultimately persuaded it to install everyone's new service line at city expense. In so doing, the city would have avoided not only the present litigation, but also the appearance of impropriety and un-

fairness that occurred when it forced some property owners to pay for the new lines, but then later changed its "policy" in the middle of the project.

The majority suggests that to give petitioners due process in this situation would "interfere with the government's ability to efficiently provide utility services." It is important to put this claim in perspective. What we are talking about here is a city-wide public improvement project that conferred no particular benefit on the petitioners. All that due process requires is some sort of notice and a public hearing at which the preliminary plans would be revealed and the public's questions of who would pay and how much would be answered. Granted, this procedure could slow down the project; but, at least, the process would be open and fair. Efficiency is not everything. In the present case, the majority's decision, coming as it does at the expense of fundamental fairness, over-emphasizes the constitutional value of efficiency.

(3) *Equal Protection Analysis*

The fourteenth amendment to the United States Constitution requires that, for purposes of economic regulation, governments must treat similarly situated persons alike unless a rational basis exists for distinguishing them. *See Little Earth of United Tribes, Inc. v. County of Hennepin*, 384 N.W.2d 435, 441 (Minn.1986). For the reasons set forth by Judge Schumacher in his dissent at the court of appeals, I believe that the city had no rational basis for requiring some, but not all, property owners to install their own gaslines and pressure regulators. *See Smith v. City of Owatonna*, 439 N.W.2d 36, 43–44 (Minn.App.1989) (Schumacher J., dissenting). I also believe that this case does not involve six projects as outlined by the court of appeals, *id.* at 41–42, but one city-wide project. Moreover, Mr. Martin testified at trial, without explanation, that the old low pressure system was replaced with a new low pressure system along a section of Main Street about two blocks from petitioner Smith's property, thus eliminating the additional expense of a pressure regulator for those property owners. The majority can point

to no rational basis for this disparate treatment because none exists. I believe that this dissimilar treatment of property owners on the same street, as well as the other dubious distinctions made by the city, establishes the arbitrary and, therefore, unconstitutional nature·of the city's actions beyond a reasonable doubt.

For all of the above reasons, I believe that the petitioners were deprived of a legitimate property interest such that they are entitled to due process and just compensation. In addition, I believe that the petitioners were denied equal protection under the law. Accordingly, I would reverse the court of appeals and reinstate the decision of the trial court.

POPOVICH, Chief Justice (dissenting).

I join the dissent of Justice YETKA.

WAHL, Justice (dissenting).

I join the dissent of Justice YETKA.